

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION



| | | |
|---|---|---|
| AMERICAN MOTORIST INSURANCE | § | |
| COMPANY and AMERICAN | § | |
| MANUFACTURERS MUTUAL | § | |
| INSURANCE COMPANY, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | Civil Action No. 3:04-CV-2575-M |
| v. | § | |
| | § | |
| SOUTHCREST CONSTRUCTION, INC., | § | |
| a/k/a, SOUTHCREST CORPORATION, | § | |
| WILLIS HOGG, and BRENDA HOGG, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiffs' Motion for Summary Judgment,[1] dated October 7, 2005.

The Court **GRANTS** the Motion.


I. FACTUAL BACKGROUND

In order to secure certain construction contracts, Defendant Southcrest Construction, Inc.

("Southcrest") sought a surety to issue performance and payment bonds on its behalf, and

ultimately selected Plaintiffs American Motorist Insurance Company and American

Manufacturers Mutual Insurance Company (collectively, "Plaintiffs" or "Sureties"). To obtain

the bonds, Southcrest and Defendants Willis M. Hogg and Brenda D. Hogg executed, in Texas,

an indemnity agreement (the "Indemnity Agreement") in favor of Plaintiffs.

---

[1]The Motion for Summary Judgment only addresses one claim, and would more appropriately be styled as a Motion for Partial Summary Judgment. Nevertheless, the Court will refer to the Motion as one for summary judgment.

-1-

Plaintiffs issued eight payment and/or performance bonds. Each bond identifies Southcrest as the Principal and either American Motorist Insurance Company or American Manufacturers Mutual Insurance Company as the Surety. The performance bonds require the Principal and/or the Surety to pay a sum certain, called a "penal amount",[2] to the respective property owner, or obligee, if the Principal does not perform its duties under a particular construction contract. The payment bonds require the Principal and/or the Surety to pay a penal amount to the obligee if the Principal or Surety does not pay for its labor, subcontractors, materials, or specially fabricated materials for a particular construction project. The following eight bonds were issued:[3]

1) A bond in connection with the Woodland Hills Apartment Renovations (the "Woodland Hills Project"), naming Operation Relief Center, Inc. as obligee, in the penal amount of $5,300,000;

2) A bond in connection with Pecan Hollow Golf Course (the "Pecan Hollow Project"), naming the City of Plano, Texas as obligee, in the penal amount of $2,100,477;

3) A bond in connection with the Northside Elementary School (the "Northside Project"), naming DeSoto Independent School District as obligee, in the penal amount of $637,600;

4) A bond in connection with the Umphress Park Project, naming the City of Dallas,

---

[2]The "penal amount" provision is akin to a liquidated damages clause. The bonds provide that if the Principal does not perform its duties under the related contract, the obligee can claim the penal amount in lieu of claiming actual damages. However, Plaintiffs have presented evidence that they settled the claims on these bonds for considerably less than the full penal amounts.

[3]On page 10 of their Motion, Plaintiffs mention a ninth project, the "African-American Museum Project." The record is not clear as to whether Plaintiffs issued a bond on this project. In any event, Plaintiffs do not claim to have lost money on any such bond, so that project is not in issue.

-2-

Texas as obligee, in the penal amount of $50,977;

     5) A bond in connection with the Charles Griffin Sub-Courthouse (the "Griffin Project"), naming Tarrant County, Texas as obligee, in the penal amount of $1,348,000;

     6) A bond in connection with the Park in the Woods Project, naming the City of Dallas, Texas, as obligee, in the penal amount of $1,712,468;

     7) A bond in connection with the Guinn School (the "Guinn School Project"), naming the City of Fort Worth, Texas, as obligee, in the penal amount of $1,826,977;

     8) A bond in connection with the Dallas Zoo Restaurant (the "Zoo Project"), naming the City of Dallas, Texas, as obligee, in the penal amount of $3,652,438.

     Each bond was issued in Texas by Southcrest's bonding agent, the William Baldwin Agency.[4]

     Plaintiffs allege that they made payments on these bonds. For example, on the Pecan Hollow Project, Plaintiffs claim that, by letter dated December 3, 2002, the City of Plano terminated Southcrest's contract on the Pecan Hollow Project, and immediately made demand on the performance bond. The City stated that the contract completion date was November 18, 2002, and as of December 3, 2002, the project was only 30% complete and at least four months behind schedule, because Southcrest had failed to provide the proper equipment, materials, and skilled workers. Following that demand, Plaintiffs retained Surety and Construction Consultants ("SCC") to evaluate the status of the Pecan Hollow Project. SCC determined that a portion of Southcrest's work on the Pecan Hollow Project was defective. Plaintiffs furnished a contractor to

---

[4]In her affidavit, Ana Velazquez Crespo, a Senior Surety Claims Analyst for Plaintiffs, states that payment bonds are generally executed by the principal's bonding agent and then delivered to the bond obligee.

complete the project and paid the City of Plano a net of $817,883.15 to settle its claim on

Plaintiffs' performance bond.[5] Plaintiffs settled nine payment bond claims asserted by various

contractors related to the Pecan Hollow Project for $232,076.37.[6]

Although the factual scenarios differ, Plaintiffs present evidence that they paid the

following amounts on the following projects to settle claims on the performance and/or payment

bonds on which they were sureties for Southcrest:[7]

1) $185,063.80 on the Woodland Hills Project;

2) $1,049,959.52 on the Pecan Hollow Project;

3) $11,953.25 on the Umphress Park Project;

4) $158,921.84 on the Griffin Project;

5) $363,860.14 on the Park in the Woods Project;

6) $23,357.00 on the Guinn School Project; and

7) $413,221.48 on the Zoo Project.[8]

---

[5]Plaintiffs initially paid $879,831 on the performance bond claim, but the City of Plano returned $61,948 after the settlement.

[6]In their Motion, Plaintiffs state this amount to be $221,732.32. The Crespo affidavit shows that Plaintiffs paid $232,076.37 on nine payment bond claims. Pl. App. at 1033.

[7]In addition to the losses directly related to payment on the bonds, Plaintiffs claim a loss of $125,277.99 for services provided by SCC and $234,644.12 for services provided by their law firm, Kleiman Lawrence Baskind Fitzgerald LLP. Plaintiffs claim that Defendants are obligated for such amounts under the Indemnity Agreement.
Due to settlements, Plaintiffs made a profit of $16,576.58 on the Northside Project, and a profit of $5,097.70 on the African-American Museum Project. Plaintiffs applied these profits to their gross losses on Southcrest's other bonds.

[8]Due to pending litigation with the City of Dallas, Plaintiffs' total obligation on the Zoo Project has not been determined. Plaintiffs' $413,221.48 claim is for payments it has made so far on the Zoo Project.

Plaintiffs filed their Motion for Summary Judgment on October 7, 2005, addressing their claims for breach of contract, but not addressing the claims in their Complaint for "exoneration", "constructive trust", or "declaratory relief".

## II. STANDARD OF REVIEW

Summary judgment is warranted when the facts and law, as reflected in the pleadings, affidavits, and other summary judgment evidence show that no reasonable trier of fact could find for the nonmoving party as to any material fact. *Pourgholam v. Advanced Telemktg. Corp.*, No. 3:01-CV-2764-H, 2004 U.S. Dist. LEXIS 10659, at *2-3 (N.D. Tex. June 9, 2004) (citing Fed. R. Civ. P. 56; *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986)). "The moving party bears the initial burden of identifying those portions of the pleadings and discovery in the record that it believes demonstrate the absence of a genuine issue of material fact, but is not required to negate elements of the nonmoving party's case." *Lynch Props., Inc. v. Potomac Ins. Co.*, 140 F.3d 622, 625 (5th Cir. 1998) (citing *Celotex*, 477 U.S. at 322-25). Once the movant carries its initial burden, the burden shifts to the nonmovant to show that summary judgment is inappropriate. *Fields v. City of S. Houston*, 922 F.2d 1183, 1187 (5th Cir. 1991).

The nonmovant is then required to go beyond the pleadings and designate specific facts that prove the existence of a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). That party may not rest on conclusory allegations or denials in its pleadings that are unsupported by specific facts. Fed. R. Civ. P. 56(e). The court must review all evidence in the record, giving credence to evidence favoring the nonmovant as

well as "evidence supporting the moving party that is uncontradicted and unimpeached, at least

to the extent that evidence comes from disinterested witnesses" and disregarding the evidence

favorable to the nonmovant that the jury is not required to believe. *Reeves v. Sanderson

Plumbing Prods., Inc.*, 530 U.S. 133, 152 (2000).  Further, "the court must draw all justifiable

inferences in favor of the nonmovant." *Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 338 (5th

Cir. 2005).

    In determining whether genuine issues of material fact exist, "factual controversies are

construed in the light most favorable to the nonmovant, but only if both parties have introduced

evidence showing that a controversy exists." *Lynch Props.*, 140 F.3d at 625.  "If the record,

taken as a whole, could not lead a rational trier of fact to find for the non-moving party, there is

no genuine issue for trial." *Friou v. Phillips Petroleum Co.*, 948 F.2d 972, 974 (5th Cir. 1991).

However, in the absence of proof, a court will not conclude that the nonmoving party could prove

the required facts. *Lynch Props.*, 140 F.3d at 625.  Further, a party must do more than simply

show some "metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.


ANALYSIS

*1. Choice of Law*

    Plaintiffs argue that Texas law applies to the Indemnity Agreement, while Defendants

urge that Illinois law applies. When a federal court sits in diversity jurisdiction, it must apply the

choice of law rules of the forum state. *R.R. Mgmt. Co. v. CFS La. Midstream Co.*, 428 F.3d 214,

222 (5th Cir. 2005) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)).

Therefore, this Court applies Texas choice of law rules. The Indemnity Agreement contains a

choice of law clause: "This Agreement shall be interpreted under the substantive law of the State of Illinois, U.S.A." Pl. App. at 1056. Texas law enforces parties' contractual choice of law unless "(1) the contract bears no reasonable relation to the chosen state or (2) the law of the chosen state violates a fundamental public policy of Texas."[9] *See Exxon Corp. v. Burglin*, 4 F.3d 1294, 1298 n.5 (5th Cir. 1993) (citing *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 677 (Tex. 1990)). Here, the parties agree that the Indemnity Agreement bears a reasonable relation to Illinois, the state whose law is chosen, because Plaintiffs are Illinois residents.

However, it is Plaintiffs, the Illinois residents, who argue against the law selected in the Indemnity Agreement, instead contending that the application of Illinois law to this case violates fundamental Texas public policy. Plaintiffs argue that the imposition of the duty of good faith and fair dealing, which Illinois courts apply to sureties in dealing with their principals, violates Texas policy. As this Court has stated, "[t]he primary difference between Illinois and Texas law regarding the interpretation of agreements of indemnity arising out of a surety relationship is the absence in Texas of a common law duty of good faith and fair dealing owed by the surety to its principal." *Continental Cas. Co. v. Paredes*, 3:98-CV-1395-G, 2000 U.S. Dist. LEXIS 375, at *13-14 (N.D. Tex. Jan. 7, 2000) (Fish, J.) (citing *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 282 (Tex. 1998) and *Windowmaster Corp. v. Morse/Diesel, Inc.*, 772 F. Supp. 1532, 1534-35 (N.D. Ill. 1988)).

---

[9]The court assumes, for the sake of argument, that Texas law would govern the Indemnity Agreement but for the parties' choice of Illinois law.

*2. Illinois Common Law Duty of Good Faith and Fair Dealing*

Illinois courts consider indemnity agreements given in consideration for the issuance of performance or payment bonds as suretyship contracts, which are construed by application of principles of suretyship law. *Windowmaster Corp. v. Morse/Diesel, Inc.*, 722 F. Supp. 1532, 1534 (N.D. Ill. 1988). A fundamental principle of suretyship law is that a contract of compensated suretyship is deemed to be a contract of insurance. *Id.* In certain instances, Illinois courts interpret insurance contracts to contain an implied duty of good faith and fair dealing. *Id.*

An insurer's duty of good faith and fair dealing to its insured arises whenever the insurer's conduct creates a risk that the insured will bear some of the loss. *Cernocky v. Indem. Ins. Co. of N. Am.*, 216 N.E.2d 198, 206 (Ill. App. 2d Dist. 1966). This is true even if an insurance contract purports to leave to the insurer complete discretion over when to settle. If the possibility exists that a judgment against the insured will exceed policy limits, an insurer has a duty of good faith and fair dealing in connection with the determination of whether or not to settle. *Id.* The duty of good faith and fair dealing has been extended from insurance contracts to contracts of suretyship. *See, e.g., Windowmaster*, 722 F. Supp. at 1534; *United States Fid. & Guar. Co. v. Klein Corp.*, 558 N.E.2d 1047, 1050 (Ill. App. 1st Dist. 1989) ("*USF&G*"). When suretyship contracts are given in exchange for indemnity agreements, the duty of good faith is present because the principal/indemnitor almost always bears the risk of loss resulting from actions of the surety. *Windowmaster Corp.*, 722 F. Supp. at 1534.

The duty of good faith owed to an insured by an insurer covers the investigation of a claim, and the decision of whether to defend or settle a claim and, if settlement is chosen, the decision as to the amount for which to settle. *Id.* In each of these contexts, under Illinois law, an

-8-

insurer must give the interests of its insured consideration equal to its own. *Id.*; *Cernocky*, 216

N.E.2d at 207. If the insurer acts in bad faith, it can be held liable to the insured for any amount

above policy limits the insured is ultimately required to pay. *See Cernocky*, 216 N.E.2d at 204.

Illinois appellate courts have limited such a duty when the indemnity agreement states that the

surety is entitled to indemnity for any payments made, as long as it believed in good faith that it

might be liable for such payments. *See, e.g., USF&G*, 558 N.E.2d at 1050; *Mountbatten Sur. Co.

v. Szabo Contracting, Inc.*, 812 N.E.2d 90, 94 (Ill. App. 2d Dist. 2004). Illinois courts have

concluded that under such provisions a surety is still entitled to indemnity for payments for

which it was not actually liable, as long as its decision to pay was made in good faith. *See

Mountbatten*, 812 N.E.2d at 94. In such circumstances, a mere allegation of bad faith does not

preclude summary judgment in favor of the surety.[10] *See id.* at 104.

    To survive a motion for summary judgment, Defendants must provide evidence of

Plaintiffs' bad faith, showing that the payments by the Sureties were not necessary or advisable

to protect any of Plaintiffs' rights or to lessen Plaintiffs' liability or alleged liability. *USF&G*,

558 N.E.2d at 1050; *Mountbatten*, 812 N.E.2d at 104 (holding that the defendants must provide

evidence that challenges the "propriety or legitimacy of any of the payments made"). Southcrest

must allege more than simply that the payments by the Plaintiffs were excessive or that the

Plaintiffs failed to offer Southcrest the right to complete the construction contracts. *See Reliance*,

_____

    [10]In *Windowmaster*, the court refused to grant summary judgment in the surety's favor,
but noted that "The parties dispute whether [the surety] gave equal consideration to the plaintiffs'
interests in settling with [the obligee], and the evidence on both sides prevents this court from
determining the answer itself." *See Windowmaster Corp.*, 722 F. Supp. at 1535. In contrast to the
facts in *USF&G*, *Mountbatten*, *Amwest*, and *Reliance*, in *Windowmaster*, the defendant presented
sufficient evidence to create a genuine issue of material fact as to bad faith. *See id.*

1989 U.S. Dist. LEXIS 3545, at *8.  Conduct expressly permitted under the terms of the

Indemnity Agreement cannot form the basis for Southcrest's assertion of bad faith on the part of

the Plaintiffs.  *See Fid. & Deposit Co. v. Marian Prof. Constr., Inc.*, No. 99 C 6787, 2004 U.S.

Dist. LEXIS 14558, at *18 n.8 (N.D. Ill. 2004). Absent evidence of bad faith, the surety seeking

indemnity need only submit evidence that payment was made on the bond.  *Travelers Cas. &*

*Sur. Co. v. P.B. Verdico, Inc.*, No. 03 C 6985, 2004 U.S. Dist. LEXIS 26160, at *8 (N.D. Ill. Dec.

30, 2004).

        Illinois case law demonstrates the very limited circumstances when a principal can

successfully prove a breach of the duty of good faith and fair dealing under an indemnity

agreement that vests a surety with "sole discretion" to settle or compromise any claim.  In

*Reliance Insurance Co. v. Dipietro Plumbing Corp.*, in response to the surety's motion for

summary judgment on its indemnity claim, the defendant construction company urged that the

surety had settled claims against it in bad faith. 1989 U.S. Dist. LEXIS 3545,  at *8. In its attempt

to defeat summary judgment, the defendant alleged that: (1) the surety made payment on the

bond despite a legal defense to the obligee's claim for payment; (2) the surety paid more than $2

million to complete only six percent of a $9 million contract; (3) the surety failed to solicit other

bids for the cost of completion of the contract once the defendant was terminated; and (4) the

surety failed to offer completion of the project to the defendant. *Id.* The court nevertheless

granted summary judgment in favor of the surety, finding that the defendant had not raised a

genuine issue of material fact as to bad faith because the surety's actions conformed to the terms

of the indemnity agreement, which allowed the surety to settle on any terms it chose. *Id.* at *9-

10; *see Fid. & Deposit Co.*, 2004 U.S. Dist. LEXIS 14558, at *19 (conduct expressly allowed by

the contract cannot itself support a showing of bad faith).

The Indemnity Agreement in this case contains the following clause:

> 5. SURETY'S RIGHTS RE: CLAIMS - Surety shall have the exclusive right to decide and determine whether any claim, liability, suit or judgment made or brought against Surety on any Bond shall or shall not be paid, compromised, resisted, defended, tried or appealed, and Surety's decision thereon shall be final and binding upon the Indemnitors.

Pl. App. at 1054. This contractual language vests the Plaintiffs with discretion, untempered by any requirement of good faith, unlike the language found in the contract at issue in *Mountbatten* or *USF&G*. Arguably, Southcrest bargained away any protections provided by the Illinois common law duty of good faith and fair dealing. *See Amwest Sur. Ins. Co. v. Szabo*, 00-C-2716, 2003 U.S. Dist. LEXIS 12715, at *13 (N.D. Ill. July 22, 2003); *USF&G*, 558 N.E.2d at 1050; *Mountbatten*, 812 N.E.2d at 103-04; *but see Reliance Ins. Co. v. Dipietro Plumbing Corp.*, No. 85 C 6985, 1989 U.S. Dist. LEXIS 3545, at *5-10 (N.D. Ill. Mar. 29, 1989) (assuming a duty of good faith, without analysis, when the contractual language vested Surety with "sole discretion" to settle or compromise any claim, but nonetheless granting summary judgment because the defendants had not raised an issue of material fact as to bad faith).

For the sake of discussion, the Court will assume that Plaintiffs are only entitled to indemnity for payments made if the Plaintiffs believed, in good faith, that they might have liability for payments they decided to make. *Cf. Reliance*, 1989 U.S. Dist. LEXIS 3545, at *6.

Here, Defendants have not provided legitimate evidence of bad faith on the part of Plaintiffs. In asserting bad faith, Defendants cite Willis Hogg's conclusory affidavit, which states the following:

> SCC and the bonding company did not act in good faith and provide fair dealing as to Southcrest's construction business. Instead, these companies appropriated

-11-

Southcrest's ongoing contracts for the benefit of other contractors, despite the fact
that we spent a lot of time and money procuring these contracts, and despite the
circumstances that existed on specific projects that showed performance was
being done, work was being completed on time, and changes were being handled.

Def. App. A at 3. Willis Hogg's affidavit does not provide relevant factual information and thus

does not defeat summary judgment in Plaintiffs' favor. The court in *Fidelity and Deposit Co. v.*

*Marian Professional Construction, Inc.* considered a similar affidavit, stating:

> There is nothing wrong with rebutting a summary judgment motion with a party's
> own affidavit. That affidavit, however, must set forth specific facts showing that
> there is a genuine issue for trial. Conclusory allegations, unsupported by specific
> facts, will not suffice. And here, conclusory allegations, not specific facts, is [sic]
> all the defendants have presented to the court. There is simply no evidence to
> support defendants' allegation that . . . [the plaintiff] overpaid on a claim. That one
> of the parties says so does not make it so, and certainly does not by itself
> constitute competent evidence to create a genuine triable issue.

No. 99-C-6787, 2004 U.S. Dist. LEXIS 14558, at *19 (N.D. Ill. July 28, 2004) (quotations and

citations omitted). Through his affidavit, Willis Hogg claims that, despite Southcrest's adequate

performance, Plaintiffs appropriated its contracts for the benefit of others. However, Hogg does

not state any facts to support such a conclusion, nor does he show how he reached such a

conclusion. Affidavits submitted in an attempt to defeat summary judgment must be based on

personal knowledge under Federal Rule of Civil Procedure 56(e) and Federal Rule of Evidence

602. *Juarez v. Menard, Inc.*, 366 F.3d 479, 484 n.4 (7th Cir. 2004). Because Willis Hogg's

affidavit is conclusory and does not comply with Federal Rule of Civil Procedure 56(e), it does

not create a genuine issue of material fact as to whether Plaintiffs acted in bad faith.[11]

---

[11]Even if the Court were to consider Hogg's affidavit, in light of the provision in the
Indemnity Agreement giving Plaintiffs the "exclusive right" to decide whether to pay any claims,
in order to defeat summary judgment for Plaintiffs, Defendants must show more than Plaintiffs'
failure to offer Southcrest the completion of the construction contract. *See Reliance Ins. Co.*,
1989 U.S. Dist. LEXIS 3545, at *8. Willis Hogg's affidavit does not show more than that.

Because Plaintiffs proved their payments, but Defendants did not prove Plaintiffs' bad faith, even if Illinois law applies, the Court finds no genuine issue of material fact as to whether Plaintiffs breached the duty of good faith and fair dealing. Thus, the Court declines to determine whether the application of such a duty violates a fundamental public policy of Texas.

*3. Elements of Indemnification*

To prevail on their indemnity claim, Plaintiffs must show (1) a contractual indemnity agreement between the Plaintiffs and Defendants; (2) the agreement obligated the Defendants to indemnify Plaintiffs in the event claims were made on the bonds;[12] (3) claims were made on the bonds; (4) all conditions precedent for recovery on the indemnity had occurred, been performed, waived, or excused; and (5) Plaintiffs have been damaged. *See Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 719 (5th Cir. 1995). Southcrest does not disagree that there are the elements, but disputes that Plaintiffs have proven the fourth and the fifth elements. Specifically, Southcrest argues that (1) Plaintiffs' proof of "default" requires resolution of disputed facts; (2) there is a genuine issue of material fact as to whether the bonds were "executed"; (3) there is a genuine issue of material fact as to damages; and (4) there is a genuine issue of material fact as to attorney

---

[12]The Indemnity Agreement provides:

1. INDEMNITY – Indemnitors agree to indemnify and hold harmless Surety immediately upon demand for any and all Loss sustained or incurred by reason of having executed any and all Bonds. The Indemnitors [sic] obligation to indemnify the Surety shall also apply to any Bond renewals, continuations or substitutes therefore. In the event of payments by Surety, Indemnitors agree to accept the voucher or other evidence of such payments as prima facie evidence of the fact and extent of the liability of Indemnitors to Surety in any demand, claim or suit by Surety against Indemnitors. Separate suits may be brought under this Agreement as causes of action accrue, and the pendency or termination of any such suit shall not bar any subsequent action by Surety. Pl. App. 1054, para. 4.

fees.

*a. "Default"*

Southcrest argues that there is a genuine issue of material fact as to whether it is in

"Default", as defined by the Indemnity Agreement, which provides:

> Default: An instance or condition in which Indemnitors, or any of them: (a.) . . .
> (b.) forfeit, breach, abandon, default or be declared in default on any Bonded
> Contract, (c.) neglect or refuse to pay for any labor or materials used in the
> prosecution of a Bonded Contract, . . .

Pl. App. at 1053, para. 5. Plaintiffs argue that it proved that Southcrest was in Default, and

Southcrest has not produced any legitimate evidence to the contrary. The parties do not dispute

that a finding of "Default" is required to sustain Plaintiffs' claim of breach of contract.

Plaintiffs produced a letter to Willis Hogg from the City of Plano, dated December 3,

2002, regarding the Pecan Hollow Project. Pl. App. at 1086-87. The letter states that (1) the

completion date for the Pecan Hollow Project was November 23, 2002; (2) the project is only

30% complete and four months behind schedule; and (3) the City of Plano and the Project

Architect have concluded that the project is behind due to Southcrest's continuing failure to

supply proper equipment, materials, and skilled workers. The letter further states that "The City

of Plano is left with no option but to find [Southcrest] in default . . ." Pl. App. at 1086. When the

City of Plano declared Southcrest in default on the Pecan Hollow Project, the Indemnitors were

in "Default" as defined by the Indemnity Agreement's Default provision §b, cited above.

Southcrest's evidence does not create a fact issue as to whether it was in default. In his

affidavit, with reference to the Pecan Hollow Project, Willis Hogg states that (1) the excavation

of a limestone outcrop "put the contract back significantly"; (2) the city refused to modify the

contract based on this defect; and (3) when Southcrest was "run off of the job[,] the contract had

not expired, [a]nd all of the work had been accepted by the contract supervisors who had

authorized interim payments." Even if true, such statements do not controvert the fact that by

letter dated December 3, 2002, the City of Plano declared Southcrest in default on Pecan Hollow,

a Bonded Contract, thus triggering the Default provision in the Indemnity Agreement.[13]

Therefore, there is no genuine issue of material fact as to whether the Defendants were in default.


*b. Were the Bonds Executed?*

      Southcrest claims that there is a genuine issue of fact as to whether the bonds were

"executed". The Indemnity Agreement provides:

> IN CONSIDERATION of the execution of any such Bonds[14] for Principal and as
> an inducement to such execution or continuation of suretyship and/or the issuance
> of Bonds by Surety, the Indemnitors, jointly and severally, agree as follows:
>
> 1. INDEMNITY - Indemnitors agree to indemnify and hold harmless Surety
> immediately upon demand for any and all Loss sustained or incurred by reason of
> having executed any and all Bonds . . .
>
> . . .
>
> 3. SURETY'S RIGHT TO DECLINE BONDS - Surety has the right to decline to
> execute any Bond requested by the Principal or Indemnitors, including any such
> Bond requested after Surety has executed a preliminary bond including, but not
> limited to, a bid or proposal bond.

Pl. App. at 1054. The parties disagree as to which entities must "execute" any bonds. Southcrest

---

      [13]"Bonded Contract" is defined as "A contract for which Surety issues or has issued a
bond." Pl. App. at 1053, para. 4.

      [14]"Bond" is defined as "Any and all bonds including but not limited to surety bonds,
undertakings and any renewals or extensions thereof issued by Surety, or issued by another at the
request of Surety, on behalf of Principal, whether issued prior to or subsequent to the effective
date of this Agreement." Pl. App. at 1053, para. 3.

avers that six of the eight bonds were not "executed", because neither Southcrest nor the Hoggs

signed them. Plaintiffs argue that all eight bonds were "executed" by the surety, and that no

action by Southcrest or the Hoggs was required.

The Court concludes that execution of these bonds by the Indemnitors was not required.

"The intent of the parties to a contract must be determined with reference to the contract as a

whole, not merely by reference to particular words or isolated phrases, but by viewing each part

in light of the others." *La Throp v. Bell Fed. Sav. & Loan Ass'n*, 370 N.E.2d 188, 191 (Ill. 1977).

The paragraph referring to the "Surety's Right to Decline", cited above, refers to execution of the

bonds by the Surety. Nothing in the Indemnity Agreement provides for Southcrest or the Hoggs

to execute the bonds.[15]

### c. Amount of Damages

Southcrest argues that because an indemnitor is not "necessarily liable for the amount the

---

[15]Plaintiffs argue that Defendants have admitted to the issuance of the subject eight bonds, citing Rule 8(d) of the Federal Rules of Civil Procedure. In paragraph nine of their Complaint, Plaintiffs state that "At the request of Defendants and relying in part upon the Agreement, Sureties issued payment and performance bonds on a number of construction projects, including the following . . . ". The eight bonds are then described in paragraphs 9(a) - 9(h) of the Complaint. In their Answer, Defendants ambiguously state that "Defendants Southcrest Corp., Willis Hogg and Brenda Hogg admit that the bonds referred to in paragraph 9a through 9h, by the sureties or either of them." Although unclear, what is clear from this response is that Defendants did not deny that the Sureties issued the bonds identified in their Complaint. Under Rule 8(d), "[a]verments in a pleading to which a responsive pleading is required . . . are admitted if not denied in the responsive pleading." Fed. R. Civ. P. 8(d).

Courts have applied Rule 8(d) in order to avoid unfair surprise by the party who failed to file a responsive pleading. *Trotter v. Jack Anderson Enters.*, 818 F.2d 431, 436 (5th Cir. 1987). However, if an averment is denied in response to a motion for summary judgment, the Court may consider that sufficient, and in this case the Court so finds. *See id.* Even if the Court did not consider Defendants' Response as sufficient, the fact that *Plaintiffs* issued bonds is not necessarily inconsistent with the argument that *Defendants* must execute the bonds.

indemnitee unilaterally paid", there is a genuine issue of material fact as to damages. *See* Def. Br. at 11 (quoting *Lamp Inc. v. Int'l Fid. Ins. Co.*, 493 N.E.2d 146, 149 (Ill. App. 2d Dist. 1986)). Without refuting *Lamp*, Plaintiffs argue that Defendants have produced no evidence controverting Plaintiffs' claimed damages.

In *Lamp*, the court considered a contract that provided for the indemnitor to reimburse the indemnitee for all attorney fees it incurred. *Lamp*, 493 N.E.2d at 149. The court concluded that the indemnitor was not necessarily liable for what the indemnitee unilaterally paid and that the indemnitee would have to establish that the fees it incurred were reasonable. *Id.* (citing *Wilson-Jump Co. v. McCarthy-Hundrieser & Assocs.*, 405 N.E.2d 1322, 1325 (Ill App. 1st Dist. 1980)). One federal district court, in *dicta*, suggests that the logic behind *Lamp* and *Wilson-Jump* should not be confined to attorney fees. In *Resolution Trust Corp. v. Harris Trust and Savings Bank*, the court stated that *Lamp* "requires that the indemnitee ultimately prove that what it paid was reasonable". *See* 90-C-7330, 1992 U.S. Dist. LEXIS 13200, at *34 (N.D. Ill. Sept. 1, 1992) (citing *Lamp*, 493 N.E.2d at 149). For the sake of argument, the Court applies *Lamp*, *Resolution Trust*, and *Wilson-Jump* to this action. In light of these cases, normally Plaintiffs must produce evidence that the amounts paid by them were *reasonable*, not only that they were paid.

The Indemnity Agreement, however, states the following: "In the event of payment by Surety, Indemnitors agree to accept the voucher or other evidence of such payments as prima facie evidence of the fact and extent of the liability of Indemnitors to Surety . . ." The court in *USF&G* considered a similar clause. In that case, after the surety provided evidence of payments, the court ruled that, to avoid summary judgment on liability and damages, the defendants needed to provide evidence rebutting the surety's prima facie case of liability. *See* 558

-17-

N.E.2d at 1052. Evidence of payments is prima facie evidence of liability for them, without a separate showing of reasonableness. Plaintiffs have presented evidence of payments in the amount of $2,309,940.74. Willis Hogg's affidavit does not controvert Plaintiffs' evidence of payments in the amount of $2,309,940.74. Thus, it does not create a genuine issue of material fact as to Plaintiff's claimed damages.

Assuming reasonableness is at issue, Southcrest argues that Willis Hogg's affidavit creates a fact issues as to reasonableness. The affidavit states:

> The amounts allegedly paid by the bonding company do not represent actual damages. The bonding company's substitute construction companies were selected based on their relationships with SCC and based on an inflated profit margin. At the time we had about six million dollars of work in progress which would have yeilded [sic] us a six hundred thousand dollar profit. We work on a 10% margin and not the 30%-40% margin that they used in their evaluation.

Hogg Aff. at 3. Willis Hogg's affidavit does not defeat summary judgment. He states that Plaintiffs chose companies which charged an inflated profit margin, without stating how he has such knowledge. Affidavits submitted in an attempt to thwart summary judgment must be based on personal knowledge as required by both Federal Rule of Civil Procedure 56(e) and Federal Rule of Evidence 602. *Juarez v. Menard, Inc.*, 366 F.3d 479, 484 n.4 (7th Cir. 2004). An affidavit need not affirmatively state that it is based on personal knowledge to be admissible as summary judgment evidence; however, a court must be able to reasonably infer personal knowledge from the affiant's position and the nature of the his participation in the matters to which he swore. *See DIRECTV v. Budden*, 420 F.3d 521, 529-30 (5th Cir. 2005). The Court cannot infer, based on the affidavit alone, that the President of a competing construction company would have personal knowledge of the profit margins of the substitute construction companies. Because the Court cannot infer personal knowledge of the profit margin of substitute

-18-

construction companies, and the affidavit does not state the basis of such knowledge, the Court

concludes that Willis Hogg's affidavit is not based on personal knowledge, does not comply with

Federal Rule of Civil Procedure 56(e), and thus cannot create a genuine issue of material fact as

to Plaintiff's claimed damages.


*d. Attorney Fees*

      Finally, Southcrest argues that Plaintiffs have failed to prove that the amount of their

attorney fees is reasonable under Illinois law. Southcrest cites *Laff v. Chapman Performance*

*Products* for the factors a court may consider in determining the reasonableness of attorney fees.

379 N.E.2d 773, 781 (Ill. App. 1st Dist. 1978)). The affidavit of Laird Lawrence, an attorney at

Kleiman Lawrence Baskind Fitzgerald LLP, establishes the reasonableness of Plaintiffs' claimed

attorneys fees, of $234,644.12. Southcrest has not provided the Court with any evidence to the

contrary. *See* Pl. App. at 1974. Assuming that reasonableness is at issue, the Defendants have

shown no issue of material fact as to the reasonableness of Plaintiffs' claimed attorney fees.

      Southcrest also argues that Plaintiffs have failed to segregate their fees between their

claims of breach of contract, declaratory judgment, exoneration, and constructive trust. Based on

the language of the Indemnity Agreement, the Court finds that any such failure to segregate is

immaterial. The Indemnity Agreement contains the following language:

> Loss: Loss includes . . . (c.) all costs and expenses incurred in connection with
> investigating, paying or litigating any claim, including but not limited to legal fees
> and expenses . . .

Pl. App. at 1053, para. 7. Plaintiffs may claim under the Indemnity Agreement for legal fees it

incurred in litigating *any* claim against Southcrest. The Lawrence affidavit establishes that the

-19-

Plaintiffs' legal fees were incurred in connection with litigation of claims against Southcrest, and thus the Indemnity Agreement provides for recovery, whatever legal theory is asserted.

*4. Prejudgment Interest*

The Indemnity Agreement reads as follows:

> 18. PAYMENTS BY INDEMNITORS . . . All sums payable to Surety under this Agreement shall bear interest if not paid by Indemnitors within ten (10) days of demand by Surety. The interest rate shall be at an annual rate of 10%, or the maximum rate permitted by applicable law if less than 10%.

Pl. App. at 1056, para. 5. Under this provision, Plaintiffs are entitled to prejudgment interest, but the Court has before it no evidence of the date of demand. Within ten days of the date of this Opinion, Plaintiffs shall submit evidence of their demand, and a proposed calculation of prejudgment interest. The Court grants Defendants ten days after service of such submission to file a response to any such evidence and calculations.

CONCLUSION

The Court **GRANTS** Plaintiffs' Motion for Summary Judgment as to their breach of contract claim, and **ORDERS** Defendants Southcrest Construction, Inc., Willis Hogg, and Brenda Hogg to pay Plaintiffs $2,309,940.74 in damages and $234,644.12 in attorney fees. The Court **ORDERS** Plaintiffs to submit, within ten days of the date of this Opinion, evidence of their demand, and a proposed calculation of prejudgment interest. The Court grants Defendants ten days after service of such evidence/calculation to file their response.

The Court **ORDERS** that, within ten days of the date of this Opinion, Plaintiffs advise the Court if it is pursuing its remaining claims against Defendants.

**SO ORDERED.**

April 17, 2006.

BARBARA M.G. LYNN
UNITED STATES DISTRICT JUDGE
NORTHERN DISTRICT OF TEXAS